LATAS LIBBY'S, INC., et al.,
Plaintiffs, Appellees,

v.

UNITED STEELWORKERS OF AMERI-
CA, Defendant, Appellant.

No. 79–1081.

United States Court of Appeals,
First Circuit.

Argued Sept. 7, 1979.

Decided Nov. 6, 1979.

John C. Falkenberry, Birmingham, Ala.,
with whom Nicolas Delgado Figueroa, Del-
gado & Zemen, Santurce, P. R., Cooper,
Mitch & Crawford, Birmingham, Ala., and
Carl B. Frankel, Pittsburgh, Pa., were on
brief, for defendant, appellant.

Pedro Pumarada, San Juan, P. R., with
whom Ira Michael Shepard, Schmeltzer, Ap-
taker & Sheppard, P. C., Washington, D. C.,
Jay A. Garcia Gregory, and Fiddler, Gonza-
lez & Rodriguez, San Juan, P. R., were on
brief, for plaintiffs, appellees.

Before COFFIN, Chief Judge, KUNZIG,
Judge, U. S. Court of Claims,* BOWNES,
Circuit Judge.

COFFIN, Chief Judge.

This appeal arises out of a strike by mem-
bers of the defendant-appellant, the United
Steelworkers of America, AFL–CIO–CLC
(the Union), against the plaintiffs-appellees,
Latas Libby's, Inc. and Licasco, Inc. (the
Company), in violation of the collective bar-
gaining agreement between the Company
and the Union. The primary issue before
this court, as·it was in the trial court, is
whether the Union is liable under section
301 of the Labor Management Relations
Act of June 23, 1947, 29 U.S.C. § 185, for
the damages caused by the illegal strike.
After a bench trial, the district court found
that the Union had both "authorized and/or

* Sitting by designation.

condoned" the strike and failed to take "all reasonable means to prevent and/or end" the strike. Based on these findings, the court assessed damages of $38,389 against the Union and entered an order enjoining the Union to "comply with the no-strike provision of the Collective Bargaining Agreement, which defendants has [sic] in effect with the plaintiffs as well as similar provisions contained in any other collective bargaining agreement which the parties may negotiate in the future." We affirm the findings of the district court on the issue of damages, but we reverse the court's issuance of an injunction mandating compliance with the no-strike provision of the contract between the parties.

### The Facts

Latas Libby's and Licasco operate a plant in Villalba, Puerto Rico, engaging in the manufacture of tin cans and ends. The United Steelworkers of America is the exclusive bargaining agent representing the production and maintenance employees at the Villalba plant. The Union members at Villalba are also organized into a local union (the Local) having its own officers, board of directors, and treasury. On July 22, 1977, the Union and the Company executed a collective bargaining agreement (the Agreement), which was in effect during the time of the events giving rise to this litigation. Article 2 of the Agreement, entitled "Responsibilities of the Parties", contains a covenant that each party will "discharge its responsibilities under [the] Agreement." Under Article 2.2(c), the Union makes the following commitment regarding strikes against the Company:

"There shall be no strikes, work stoppages, or interruption or impending [sic] of work. No officer or representative of the Union or employee shall authorize, instigate aid or condone, any such activities during the life of this Agreement."

Concomitant with this provision, Article 9 of the Agreement provides that all "grievances" involving "the interpretation or application of, or compliance with, the provisions of [the] Agreement", if not satisfactorily resolved through the grievance procedures set forth in the Agreement, may be submitted to binding arbitration by either party.[1]

In early October, 1977, the Company instituted changes in the working hours of the plant's three-shift schedule. These changes so upset the workers that they began to talk about a strike against the Company. The Local leadership, eschewing the available grievance mechanism and disregarding the no-strike clause in the Agree-

---

1. The Agreement establishes the following grievance and arbitration procedure:

"ARTICLE 9—GRIEVANCE AND ARBITRATION

.        .        .        .        .

*Grievance Procedure*

9.4 Grievances arising under this contract shall be settled in the following manner: Step 1: The employee will discuss the matter with his immediate Supervisor. If necessary, the shop steward will also intervene. The Supervisor will have twenty four (24) working hours to give his decision.
Step 2: If the immediate supervisor does not give a solution to the matter submitted to him, the grievance or complaint will be submitted to the Company management in writing. The grievance will be discussed between the Grievance Committee and the persons designated by management. Management will have three working days to give their decision in writing.
Step 3: In case the matter is not solved in the above mentioned steps, then within the following five (5) days from the date of the written answer in Step 2 the complaint or grievance will be submitted by the Company or the Union to this step and will be discussed between the International Union representative if he is in the island, the grievance committee and authorized representatives of the Company. The Company will have five (5) working days to give its decision in writing.
*Arbitration*
9.5 If the grievance has not been satisfactorily solved in Step 3, a request for arbitration shall be made to the other party in writing within twenty (20) days after receipt of the answer in Step 3. The Union or the Company may submit the matter to arbitration requesting the Puerto Rico Labor Department to designate an arbitrator. The decision of the arbitrator shall be final and binding upon the parties. The arbitrator shall have no jurisdiction to alter, amend or modify the provisions of this Agreement."

ment, called and presided over a meeting at which a strike vote was taken.

On Monday, October 17—after the strike vote had been taken, but three days before the beginning of the strike—the vice president of the Local, Ramon Hernandez, who was then the presiding officer of the Local, telephoned the representative of the Union, Alejo Velazquez, to advise him of the problem. Although Hernandez testified that he did not remember telling Velazquez that a strike vote had been taken, he did tell him that the employees were upset over the changes in working hours, and he insisted that Velazquez come to the plant because "the people wanted to stop working." Velazquez told Hernandez that a strike would be "illegal", but said that he was very busy and could not visit the plant until Wednesday, October 19. On direct examination, Hernandez related the statement made to him by Velazquez during the course of that conversation as follows:

> HERNANDEZ: "He told us that he couldn't come until Wednesday and that if we wanted to stop, to stop until Wednesday."

On cross-examination, Hernandez "explained" his response to Velazquez's statement as follows:

> COUNSEL: "Then this time you decided to go on with the strike even though Mr. Velazquez could not be there until Wednesday."
>
> HERNANDEZ: Well, as I stated before we didn't pay attention to him; that is he told us that but we did not stop . . . .. I didn't follow his instructions. I didn't pay attention."

On redirect examination, Hernandez testified that while Velazquez advised him that a strike would be illegal, he also said "if you want to go on strike, go ahead".

On Wednesday, October 19, the day before the commencement of the strike, Velazquez and Felix Raul Perez, president of the Local, made a joint telephone call to Jose A. Rivera, personnel manager of the Villalba plant, to discuss the complaints of the employees caused by the change in working hours. Rivera testified that during that conversation Velazquez told him the employees were going to strike and that he responded by insisting Velazquez ensure that the employees instead utilize the arbitration mechanism to resolve the grievance. On the following morning, however, the employees commenced a strike at the Villalba plant. Rivera visited the plant on Thursday morning, unsuccessfully urged Perez to get the employees back to work, and then tried to reach Velazquez at the Union's office in Ponce. Unable to reach Velazquez on Thursday, Rivera sent a telegram to the Ponce office on Friday morning informing Velazquez of the strike, demanding that the employees return to work, and suggesting that they submit their grievance to the arbitration process. Velazquez, who was in Hato Rey negotiating a contract with another employer, spoke to Rivera by telephone at approximately 1:00 p. m. on Friday, October 21. When Rivera asked Velazquez to meet him at the plant that afternoon, Velazquez replied that he was too busy to return to Villalba on Friday, that in fact he would not be able to meet with Rivera until Tuesday, October 25.[2] At trial, Velazquez admitted that he could have reached Villalba by 3:30 Friday afternoon; instead he had lunch in Hato Rey and then returned to Ponce.[3]

On Tuesday, Rivera and the Villalba plant manager met with Velazquez, Perez, and Hernandez in an attempt to settle the strike. During the course of the negotiations, Velazquez told Rivera that the employees would not return to work unless the Company agreed to reinstate three employees, including Hernandez, who had been suspended by the Company for being instigators of the strike. Velazquez eventually retreated from this position, and the Union

---

**2.** Monday, October, 24, was a holiday in Puerto Rico, and the Villalba plant was scheduled to be closed.

**3.** Villalba is approximately 15 miles from Ponce. From Velazquez's testimony, it appears that driving time from Hato Rey to Villalba would have been only slightly longer than to Ponce.

members agreed to end the strike and pursue their grievance through the procedures established by the Agreement. Work resumed on Wednesday, October 26.

*Liability of the Union for Strike Damages*

■ Since this is a suit for breach of contract brought under section 301 of the Labor Management Relations Act, 29 U.S.C. § 185,[4] our review must focus on and proceed from the language of the no-strike provision in the Agreement. No court has held that a no-strike clause such as the one in this case—"there shall be no strikes"—imposes absolute liability on a union for any strike occurring during the life of the contract. *United States Steel Corp. v. United Mine Workers*, 519 F.2d 1249, 1253 (5th Cir. 1975); *see North American Coal Corp. v. United Mine Workers*, 497 F.2d 459 (6th Cir. 1974). The ample body of case law in this area reveals a variety of approaches to implied union obligations to prevent or end illegal strikes both in cases involving explicit no-strike provisions, *see, e. g., Eazor Express, Inc. v. International Brotherhood of*

*Teamsters*, 520 F.2d 951 (3d Cir. 1975), *cert. denied*, 424 U.S. 935, 96 S.Ct. 1149, 47 L.Ed.2d 342 (1976); *Penn Packing v. Amalgamated Meat Cutters Local 195*, 497 F.2d 888 (3d Cir. 1974), and those in which a no-strike covenant is inferred from provisions requiring the company to submit to binding arbitration, *see, e. g., Carbon Fuel Co. v. United Mine Workers*, 582 F.2d 1346 (4th Cir. 1978), *cert. granted*, 440 U.S. 957, 99 S.Ct. 1495, 59 L.Ed.2d 769 (1979); *United States Steel Corp. v. United Mine Workers*, 519 F.2d 1249 (1975); *Haislip Baking Co. v. United Construction Workers*, 223 F.2d 872 (4th Cir.), *cert. denied*, 350 U.S. 847, 76 S.Ct. 87, 100 L.Ed. 754 (1955).

We need not add our voice to the debate over obligations implied in a no-strike agreement, however, because in the instant case the Agreement describes with particularity the Union's responsibilities to avoid strikes: "No officer or representative of the Union . . . shall authorize, instigate aid or condone [any strike]." The district court concluded that the Union had "authorized and/or condoned the illegal strike."[5]

---

4. The district court found that the Company and the Union are, respectively, "an employer and a labor organization representing employees in an industry affecting commerce" within section 301(a) of the Act, 29 U.S.C. § 185(a).

The district court did not consider, and the parties have not briefed, whether it should have stayed this damage action pending arbitration of the Company's grievance under the procedure provided by the Agreement. In *Drake Bakeries, Inc. v. Local 50, American Bakery & Confectionery Workers, Int'l*, 370 U.S. 254, 82 S.Ct. 1346, 8 L.Ed.2d 474 (1962), the Supreme Court held that a damage action for a violation of a no-strike provision should have been stayed pending arbitration because the collective bargaining agreement provided that all grievances involving acts of the employer *or* the union would be submitted to arbitration. Nor was it necessary, said the Court, for the arbitration provision to expressly include the no-strike clause within the scope of arbitrable provisions of the contract. *Id.* at 257–60, 82 S.Ct. 1346. *See General Dynamics Corp. v. Local 5, Industrial Union of Machine and Shipbuilding Workers*, 469 F.2d 848 (1st Cir. 1972). *But see Atkinson v. Sinclair Refining Co.*, 370 U.S. 238, 82 S.Ct. 1318, 8 L.Ed.2d 462 (1962) (court not required to stay damage action where collective bargaining agreement precluded invocation of arbitration procedure by company). At first blush, the grievance and arbi-

tration provisions of the Agreement in this case, which provide for arbitration of disputes arising out of all provisions of the Agreement, would seem to require a stay under *Drake Bakeries*. Closer examination of the specific provisions of the grievance-arbitration procedure, however, reveals that the intent was to provide for arbitration only in the case of employee-initiated grievances. *See* note 1, *supra.* This court has held that in such a case, the inferences to be drawn from the specific provisions control. *G. T. Schjeldahl Co. v. Local Lodge 1680, Int'l Ass'n of Machinists*, 393 F.2d 502 (1st Cir. 1968). Thus, a dispute precipitated by the Union's violation of the no-strike provision need not be submitted to arbitration.

5. Citing *Eazor Express, Inc. v. International Brotherhood of Teamsters*, 520 F.2d 951 (3rd Cir. 1975), the district court also found that the Agreement necessarily implied an obligation on the part of the Union to "take all reasonable steps in order to prevent and/or end the strike as soon as possible", which the court concluded the Union had failed to do. Because we conclude that the Union breached the duties expressly imposed on it by the Agreement, we need not reach the question of the scope of obligations implied in a no-strike contract provision.

Our review of the record convinces us that the district court was not clearly erroneous in finding either authorization or condonation.

The district court concluded that the Union "authorized" the strike because Velazquez, who was stipulated to be an agent of the Union, expressly or impliedly sanctioned the illegal stoppage.[6] The Company, both in its brief and at oral argument, asserted that in his October 17 conversation with Hernandez, *supra*, Velazquez said that the men should go on strike immediately, until he could visit the plant on Wednesday. The district judge accepted this interpretation of Hernandez's testimony, stating in his findings of fact that "Hernandez decided not to follow the advice of Mr. Velazquez and decided not to call the strike that day [Monday]." In view of the ambiguity of Hernandez's testimony and the district judge's advantage of having heard the testimony delivered in the witness's own language, Spanish, we cannot find this conclusion clearly erroneous.[7] Moreover, when viewed in light of his admittedly cryptic remarks to Hernandez, Velazquez's apparent indifference to the possibility of a strike and his unwillingness to come to Villalba to meet with the members of the Local provide a sufficient basis for the district court to have concluded that Velazquez at least implicitly sanctioned the strike.[8]

The district court also found that the Union had "condoned" the strike. The Union argues that Velazquez, rather than condoning the strike, "openly and directly opposed it [and] never varied from his position that any work stoppage would be illegal." Although the record supports the Union's assertion that Velazquez repeatedly advised the officers of the Local that the strike was illegal, we agree with the district court that his conduct constituted condonation of the strike.

Webster's Third New International Dictionary (1966) defines "condone" as "[to] permit the continuance of"; the American Heritage Dictionary (1976) defines it as "to forgive, overlook, or disregard (an offense) without protest or censure." The express terms of the no-strike provision, read literally, thus prohibit the Union from disregarding a strike and permitting its continuance once it has commenced, regardless of whether the Union itself authorized or instigated the strike. We think it clear that this language imposes an obligation on the Union to take some affirmative steps toward ending a strike. We need not explore the limits of this obligation, for the Union, through Velazquez, made only the most minimal effort to end this strike. Velazquez testified that when he spoke to Hernandez on Friday, the day after the commencement of the strike, he told Hernandez, "listen, there is a violation of the

---

**6.** The validity of this finding does not depend on a showing that the Union authorized the particular acts by which the court found Velazquez had approved the strike. Section 301(e) of the Labor Management Relations Act, 29 U.S.C. § 185(e), provides that for purposes of determining liability under section 301, the question whether a person is an agent of another shall not be controlled by "whether the specific acts performed were actually authorized or subsequently ratified [by the principal.]" *See United Mine Workers v. Gibbs*, 383 U.S. 715, 736, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966); *Vulcan Materials Co. v. United Steelworkers*, 430 F.2d 446, 457 (5th Cir. 1970), *cert. denied*, 401 U.S. 963, 91 S.Ct. 974, 28 L.Ed.2d 247 (1971).

**7.** Although the Union emphasizes that when Hernandez spoke to Velazquez on Monday, October 17, he failed to tell him that a strike vote had been taken, we do not find this dispositive.

First, since Hernandez testified that he did not remember telling Velazquez of the strike vote, it is unclear whether in fact Velazquez was ignorant of the vote. Second, even if Hernandez did fail to disclose this bit of information, our reading of the transcript convinces us that the tenor of the conversation should have made clear to Velazquez that immediate intervention was required to avoid a strike.

**8.** The district court had a second basis for its finding of Union authorization: by relying on *Adley Express Co. v. Highway Truck Drivers Local 107*, 349 F.Supp. 436 (E.D.Pa.1972), the court made clear that it regarded the Local officers, Hernandez and Perez, to be agents of the Union. Because we find sufficient support for the court's conclusion that Velazquez authorized the strike, we need not address this ground for the district court's decision.

agreement and you should try to go back to work." Velazquez did not threaten to impose sanctions against Hernandez and other Local officials if they did not end the strike immediately, nor did he unequivocally order Hernandez to terminate the strike. Even after Hernandez responded that he had tried unsuccessfully to convince the workers to return, Velazquez declined to return to Villalba on Friday to try to arrange a meeting with management, thus ensuring that the stoppage would continue after the weekend. We conclude that the only significant step taken by Velazquez to end the strike before Tuesday, October 25—explaining to Hernandez that the strike was illegal—was foreseeably ineffective. *See United States Steel Corp. v. United Mine Workers*, 598 F.2d 363, 366 (5th Cir. 1979); *Vulcan Materials Co. v. United Steelworkers, supra*, 430 F.2d at 457; *Adley Express Co. v. Highway Truck Drivers Local 107, supra*, 349 F.Supp. at 444.[9]

Velazquez's behavior is also sufficient to impute to the Union "forgiveness" of the strike. Not only did he fail to threaten or institute any Union sanctions against the Local officials, but during the negotiations with the Company he demanded that the Company reinstate Local members who had been suspended for instigating the strike. Moreover, at no time during the course of the strike did Velazquez, or any other official of the Union, publicly disavow or censure the actions of the striking workers. The record supports a finding that the Union, by permitting the continuance of the strike and by failing to disavow or censure the actions of the strike's instigators, condoned the strike and thus violated the provisions of the Agreement.

█ As its final argument against imposition of damages for this illegal strike, the Union argues that even if the district court properly found the Union liable, the Company failed to adduce sufficient evidence to support the court's determination of dam-

ages. The sole evidence presented at trial on the question of damages was the uncontradicted testimony of Jose A. Rivera, Villalba personnel manager, that the plant suffered monetary damages of $38,389 as a result of the strike. The Company produced no accounting records or other documents to establish lost profits for the period that the plant was shut down (three working days), but the district judge found Rivera's testimony credible and awarded damages in the full amount claimed.

The Union quite correctly points out that a plaintiff bears the burden of proving the amount of the damages claimed and that a court's award of damages may not be based on mere conjecture or surmise. Although if contested, the Company's evidence might have been insufficient to sustain the damages sought, since the district judge found Rivera's statement credible, no speculation or surmise was required. The Union had ample opportunity to cross-examine Rivera and discredit his testimony at trial and to argue the insufficiency of the evidence of damages in its post-trial brief. It chose to do neither of these. We decline to reverse on the basis of this late challenge to precise and uncontradicted testimony on the amount of the Company's damages.

### The Injunction Against Future Strikes

█ In addition to assessing damages against the Union, the district court found that as a result of the Union's breach of the no-strike clause the Company was entitled to prospective relief. The court therefore entered an order enjoining the Union and its agents and representatives "to comply with the no-strike provision of the Collective Bargaining Agreement . . . as well as similar provisions contained in any other collective bargaining agreement which the parties may negotiate in the future." The Union argues that this broad injunction exceeds the scope of relief per-

---

9. The evidence supporting this finding of condonation also prevents the Union from arguing that it should be absolved of any liability for having authorized the strike because it later took sufficient measures to end the strike. *See*

*United States Steel Corp. v. United Mine Workers, supra*, 598 F.2d at 366; *Adley Express Co. v. Highway Truck Drivers Local 107, supra*, 349 F.Supp. at 444.

missible under *Boys Markets, Inc. v. Retail Clerks Local 770,* 398 U.S. 235, 90 S.Ct. 1583, 26 L.Ed.2d 199 (1970). We agree.

In *Boys Markets* the Supreme Court worked a compromise between section 301 of the Labor Management Relations Act and section 4 of the Norris-LaGuardia Act, accommodating the former's policy favoring resolution of labor disputes by arbitration with the latter's stricture against anti-strike injunctions. Although the Court endorsed the use of injunctions to enforce a union's contractual obligation not to strike over arbitrable issues, Justice Brennan's opinion made clear that injunctive relief was not appropriate in every case of such a strike: the decision did not establish a generally applicable specific performance remedy. *Boys Markets, supra,* 398 U.S. at 254, 90 S.Ct. 1583; *see Anheuser-Busch, Inc. v. Teamsters Local 633,* 511 F.2d 1097, 1099 (1st Cir.), *cert. denied,* 423 U.S. 875, 96 S.Ct. 148, 46 L.Ed.2d 109 (1975); Smith, *The Supreme Court, Boys Markets Labor Injunctions, and Sympathy Work Stoppages,* 44 U.Chi.L.Rev. 321, 327 (1977). *Boys Markets* thus requires a case-by-case adjudication of the propriety of injunctive relief against illegal strikes. *United States Steel Corp. v. United Mine Workers,* 519 F.2d 1236, 1245 (5th Cir. 1975), *cert. denied,* 428 U.S. 910, 96 S.Ct. 3221, 49 L.Ed.2d 1217 (1976). A broad prospective injunction would appear to be inconsistent with such a case-by-case approach. *See United States Steel Corp. v. United Mine Workers,* 534 F.2d 1063, 1075 (3d Cir. 1976). A court's power, under *Boys Markets,* to issue prospective injunctions is further limited by section 9 of the Norris-LaGuardia Act, which provides that a labor injunction may contain "only a prohibition of such specific act or acts as may be expressly complained of in the bill of complaint or petition filed in such case." 29 U.S.C. § 109.

The circuit courts have reached different conclusions in cases involving injunctions, like the one issued by the district court in this case, couched in the terms of the no-strike provision of the collective bargaining agreement between the parties. *Compare CF & I Steel Corp. v. United Mine Workers,* 507 F.2d 170 (10th Cir. 1974); *Old Ben Coal Corp. v. Local 1487, United Mine Workers,* 500 F.2d 950 (7th Cir. 1974), *with United States Steel Corp. v. United Mine Workers,* 534 F.2d 1063 (3d Cir. 1976); *United States Steel Corp. v. United Mine Workers,* 519 F.2d 1236 (5th Cir. 1975), *cert. denied,* 428 U.S. 910, 96 S.Ct. 3221, 49 L.Ed.2d 1217 (1976). These courts have agreed, however, that "the breadth of an injunction is to be determined by the extent of the misconduct." *Old Ben Coal Corp., supra,* 500 F.2d at 953. In both *Old Ben Coal Corp.* and *CF & I Steel Corp.,* there was a history of past violations of the union's obligation not to strike, and in both cases the district court had found that there was a likelihood of future breaches. The courts in these cases upheld the district courts' orders enjoining strikes over the life of the collective bargaining agreements as being necessary to ensure the integrity of the parties' contractual commitments to arbitration. *CF & I Steel Corp., supra,* 507 F.2d at 173–77; *Old Ben Coal Corp., supra,* 500 F.2d at 953. In contrast, the Third Circuit, in *United States Steel Corp.,* found an injunction against all future strikes to be overly broad, since the district court had failed to relate the likelihood of future strikes to past acts of the defendant union's representatives. 534 F.2d at 1077 (remanding for further proceedings). The Fifth Circuit, similarly faced with an injunction framed in terms of the contract between United States Steel and the United Mine Workers, went even further, holding that an injunction against *any* strike necessarily violated the specificity requirements of section 9 of the Norris-LaGuardia Act. *United States Steel Corp., supra,* 519 F.2d at 1245–46.

This case differs from each of the above in that the record discloses no prior violations of the no-strike agreement between the Union and the Company. We are guided by the premise that "[p]rospective injunctive relief should go as far as, but no farther than, the pattern of violations suggests is necessary." *United States Steel Corp., supra,* 534 F.2d at 1077. Although we do not say that repeated violations of a

no-strike covenant never warrant broad prospective relief, in the absence of any showing here of a continuing course of conduct evidencing the unwillingness of the Union to abide by the no-strike provision of the Agreement, an injunction as broad as that entered by the district court cannot stand.[10]

*The judgment of the district court is affirmed in part and reversed in part.*

---

10.  Even if there were evidence of repeated violations by the Union, we would be unable to affirm this injunction. As now framed, the injunction does not satisfy the requirements of section 9 of the Norris-LaGuardia Act or rule 65(d) of the Federal Rules of Civil Procedure. The court's order gives no specific guidance to the Union with respect to the steps the Union must take to avoid contempt liability for the occurrence of future strikes. The harassment value to a successful plaintiff of an injunction such as the one issued by the district court below is considerable. The Union should not be placed in a position of having to defend against contempt sanctions as a result of *any* strike against the Company in the future, under this or subsequent agreements. *See United States Steel Corp., supra,* 534 F.2d at 1078.