# United States Court of Appeals
## For the First Circuit

No. 10-2092

VERIZON NEW ENGLAND, INC.,

Plaintiff, Appellant,

v.

INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS,
LOCAL NO. 2322,

Defendant, Appellee,

INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS,
LOCAL NO. 2323,

Defendant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Richard G. Stearns, U.S. District Judge]

Before

Lynch, Chief Judge,
Torruella and Boudin, Circuit Judges.

Arthur G. Telegen, with whom John E. Duke and Seyfarth Shaw, LLP were on brief, for appellant.
Harold L. Lichten, with whom Timothy Belcher, Lichten & Liss-Riordan, P.C., Alfred Gordon, and Pyle Rome Ehrenberg, P.C. were on brief, for appellee.

June 30, 2011

**LYNCH**, **Chief Judge**.  This appeal arises from a denial of injunctive relief against a union under Boys Markets, Inc. v. Retail Clerks Union, Local 770, 398 U.S. 235 (1970), and § 301 of the Labor-Management Relations Act (LMRA), 29 U.S.C. § 185, as well as a denial of declaratory relief concerning actions previously taken by that union.  We affirm the denial of injunctive relief, vacate the denial of declaratory relief, and remand.

Verizon New England, Inc. (VNE) alleges that the International Brotherhood of Electrical Workers, Local 2322 (the Union) violated a collective bargaining agreement (CBA) no-strike clause on four occasions in 2008 and 2009.  VNE argues that these acts were part of a pattern of behavior undercutting the arbitral process that warrants federal court relief.  It alleges that the Union did not comply with the CBA when its members (1) made representations that the Union would fine members who brought required devices to work, (2) engaged in a short but concerted work stoppage, (3) coordinated refusals to volunteer for overtime work, and (4) protested at a VNE facility each morning for several weeks.  VNE seeks injunctive relief and, in the alternative, declaratory relief in furtherance of the arbitral process.

The district court granted the Union's motion for summary judgment, finding that VNE had not shown future harm and declining to issue either injunctive or declaratory relief.  Verizon New England, Inc. v. Local No. 2322, Int'l . Bhd. of Elec. Workers, No.

09-10165-RGS, 2010 WL 3282605 (D. Mass. Aug. 20, 2010). Because a Boys Markets injunction must meet the traditional standards for injunctive relief and because VNE has not, at this point, demonstrated irreparable injury, we find no abuse of discretion in the district court's denial of injunctive relief. However, because we believe the district court misapprehended the relevant legal standard for declaratory relief, we vacate the denial of that relief and remand for further consideration of the issue.

I.

The CBA, effective from August 3, 2008 until August 6, 2011, contains a no-strike clause at Article G10. The clause provides,

> The Union agrees that during the term of this Agreement, or any extension thereof, it will not cause or permit its members to cause, nor will any member of the Union take part in, any strike of or interference with any of the Company's operations or picketing of any of the Company's premises.

Notably, the clause prohibits interference with operations and picketing of company premises in addition to strikes. It also imposes obligations on the Union with respect to both its own conduct and the conduct of its members.

Under Article G8 of the CBA, the Union may submit to a grievance process any "complaint involving the interpretation or application of any provisions of this Agreement" and any "complaint that an employee or group of employees for whom the Union is the

bargaining agent has, in any manner, been unfairly treated." After the conclusion of the final step of the grievance procedure, under Article G9 the Union may demand arbitration when it believes "the intent and meaning of one or more of the Articles of this Agreement . . . has been violated by the Company," provided that certain procedural prerequisites have been met. The CBA allows for expedited arbitration for "any grievance involving the suspension of an individual employee."

The CBA does not permit VNE to invoke the grievance procedure to institute the process leading toward arbitration. Only the Union may do so, and VNE contends that the Union's failure to invoke these procedures led to this lawsuit. Rather than follow the grievance process, VNE asserts, the Union and its members have taken "self-help" measures in violation of the no-strike clause. In its complaint, VNE focused on what it asserts are four such prohibited self-help measures. One of these alleged violations was in response to a new company rule concerning the transport of company tools, while the remaining three alleged violations followed an altercation between a Union member and his supervisor.

VNE has sought to place these instances within the context of a previous pattern of conduct it claims violated the no-strike clause. Most of these incidents involved other locals: Locals 2321, 2324, and 2222. As to incidents involving other locals, VNE asserts that since 2007 there have been two alleged

incidents of picketing, a "sit-down" strike, a boycott of overtime, and pressures by local representatives to reduce productivity. VNE also alleges that there have been "[p]eriodic efforts" by "several Locals to discourage bargaining unit employees from accepting temporary assignments to management positions going back to the mid-1980s." As to incidents involving Local 2322, the defendant here, VNE notes that members protested the discipline of an employee in 2001 by engaging in a "sick out," which was enjoined by Verizon New England, Inc. v. International Brotherhood of Electrical Workers, No. 01-11636, slip op. at 1-2 (D. Mass. Nov. 17, 2001).

The first of the four alleged violations at the core of this suit followed the introduction of a company rule that employees transport company-issued tool kits between job sites. An earlier rule had required only that tools be on the job site with the employee. For Equipment Installation Technicians (EI Techs), employees who are routinely assigned to work on lengthy projects at remote locations in the field, company-issued tool kits included cell phones equipped with global positioning capabilities. Some EI Techs, apparently concerned that VNE might use the phones to track their movements, refused to comply with the new rule. VNE disciplined two employees for non-compliance with the rule shortly after it was issued, and the Union grieved these disciplinary actions.

In addition to filing these grievances, the Union established a set of "EI Work Rules." The chief steward for EI Techs, Katherine Crowley, drafted these rules after confirming with the Union's business manager and highest official, Eugene McLaughlin, that the EI Techs could create such rules and after confirming with the Union's assistant business manager, Chris Jolls, that such rules could be enforced by fines. One rule stated that it was the Union's position that employees must be paid to travel or transport any company tools they choose to carry on personal time. The rule instructed EI Techs to claim overtime and travel expenses, and stated that if overtime and travel expenses were denied, "this must be grieved." It continued, "[t]his is not negotiable and is contractual."

The EI Techs adopted the rules at a Union meeting. Shortly thereafter, on January 8, 2009, Crowley sent an email to Union members. The email stated, "The decision has been made to enforce the union E.I. Work Rule number one in regard to the tools. The union stance is as follows, <u>do not transport any tools (except for the 3 items under protest</u>) for the manager[s]. . . . You could be subject to answer . . . for your actions and a possible fine. . . ." After Crowley sent this email, McLaughlin called her and told her not to send any more email messages. Crowley was not told why she should not send any additional emails, however, nor

was she told to retract the email. She received no instruction as to how to enforce the EI Work Rules, and remained a chief steward.

VNE alleges that only one EI Tech did not comply with the EI Work Rules, and that he was spoken to by many of the other employees. The Union, by contrast, alleges that no EI Tech ever failed to actually carry the company's tools. On this motion for summary judgment, we must take any conflict in the evidence in the light most favorable to VNE, the non-moving party. It is undisputed that no employees were disciplined by the Union for failing to comply with the EI Work Rules.

The three other alleged violations at the core of this suit followed an August 25, 2009 confrontation between a splice-service technician (SST), Peter Sem, and his supervisor, Patty Regan, in a parking lot next to the VNE garage in Brockton where they worked. The facts concerning the altercation are disputed, though again we must take the facts in the light most favorable to VNE, the non-moving party. VNE alleges that Sem was drinking and that when Regan approached with a camera he assaulted her and broke the camera.[1] VNE suspended and later fired Sem as a result of the altercation. Regan also filed a criminal complaint against him; Sem was placed on probation and ordered to pay Regan $313 in restitution.

---

[1] The Union contends that Regan accosted Sem and that, as Sem attempted to defend himself, Regan dropped her camera.

-7-

The second alleged violation of Article G10 occurred a few days after the altercation, on August 28, 2009. That morning, all the employees in the garage refused to work until they had spoken to a third-level supervisor, Lance Cummings. The garage's chief steward, Bob Wall, told a first-level supervisor, Michael Shea, that the employees felt unsafe around Regan. Shea responded that Cummings would not come to the garage and that the employees needed to return to work. The employees did not return to work, and after about forty-five minutes Shea told them that if they did not return to work within five minutes they would be suspended. In the ensuing five minutes, during which only a few employees returned to work, Shea contacted the Union's new business manager, Erik Hetrick. Shea informed Hetrick that VNE was about to suspend almost all of the employees at the garage.

Hetrick requested that Shea delay any suspensions until he could get to the garage, and drove from the Union headquarters in Middleboro to the garage in Brockton. Once Hetrick arrived he spoke with the employees and reassured Shea that he believed the situation would resolve itself. He then called Cummings and requested that Regan not interact with the employees until after a representative from VNE's Employee Assistance Plan had spoken with them the following Monday. After Cummings accepted that request, the employees returned to work. VNE estimates that this work stoppage delayed the start of the work day by between an hour and

an hour and a half, and argues that the stoppage violated the no-strike clause in Article G10. The Union submits that the delay was shorter, but we take the estimate of VNE, the non-moving party.

VNE alleges that a third violation of Article G10 also began on August 28, 2009, when employees at the Brockton garage who had previously made themselves available to work voluntary overtime refused to work that overtime. VNE's Director of Labor Relations, Joseph Santos, informed Hetrick in a letter dated the same day that the employees declining overtime were acting "in protest of a dispute subject to arbitration under the collective bargaining agreement." The letter stated that the Union's obligations under Article G10 of the agreement required that it not permit such interference with VNE's operations. Santos requested that Hetrick inform him of the actions the Union was taking to restore voluntary overtime. Hetrick responded by fax stating that it was the Union's position that it had satisfied its obligations under Article G10. By September 3, 2009, every SST in the Union was refusing voluntary overtime.

Finally, VNE alleges that employees at the Brockton garage violated the no-strike clause of the CBA by picketing the entrance to the garage. It is undisputed that on September 1, 2009, about twenty EI Techs began protesting in front of the Brockton garage each morning between 7:15 and 7:30. The employees walked between the two entrances of the garage and some carried

signs. The Union denies that it organized these actions, but it acknowledges that Hetrick and other Union leaders participated. The Union has conceded that these protests lasted a few weeks.

In its supplemental complaint, VNE argued that these actions interfered with VNE's business and that the Union failed to meet its obligations to prevent and eliminate these interferences. It argued that the alleged CBA violations caused irreparable injury to VNE by undermining the grievance and arbitration provisions of the CBA and by injuring VNE's goodwill among customers in the telecommunications field. VNE acknowledged that the damages resulting from these alleged harms were not "readily ascertainable," and has not pursued the request for damages it nonetheless included in its complaint. It has focused on the two other forms of relief it requested: injunctive relief and declaratory relief. The proposed injunctive relief would enjoin the Union to take adequate steps to prevent future strike activities.

The Union sought summary judgment arguing that VNE had failed to identify a violation of the no-strike clause and that in any case VNE had failed to show that any violations had caused damages or irreparable harm. It argued that (1) VNE had not found that any employee refused to carry company tools as directed by VNE, and at any rate the Union was not responsible for the actions of a rogue Union steward directing members not to follow the

policy; (2) the Union acted swiftly to resolve the initial protest at the Brockton garage and prevented it from causing any harm to VNE; (3) VNE employees were entitled to refuse voluntary overtime because VNE may compel mandatory overtime, and the fact that VNE did not compel mandatory overtime demonstrates that it was not harmed by this refusal; and (4) the protests held outside of the Brockton garage did not constitute picketing, and at any rate did not cause VNE any harm. Further, the Union argued, VNE had available contract remedies; that is, VNE could have suspended employees, provoking the Union to start the arbitral process.

Without detailing all of VNE's responses, it is quite clear that the Union was not entitled to summary judgment based on its defense that there neither was nor could have been a breach of the CBA's no-strike clause. At the very least, there were facts in dispute and the Union's attempt to disclaim any responsibility is unfounded. VNE provided evidence that the purportedly rogue Union steward acted with the Union's approval and complicity, that the sit-down strike and picketing were a classic example of wink/wink, nod/nod by Union officials, and that at least the voluntary overtime boycott affected its operations.

The district court did not assess the evidence as to whether CBA violations had occurred. Instead, it assessed the level of harm to VNE and the ongoing nature of the alleged violations. The district court granted summary judgment for the

Union on VNE's request for injunctive relief, finding that VNE had not alleged any ongoing breach of the CBA and had not adequately alleged either irreparable harm or a threat of a future CBA breach. Verizon New England, 2010 WL 3282605, at *5-7.

The district court also granted summary judgment for the Union on VNE's request for declaratory relief, finding that two of the four alleged CBA violations presented no threat of recurrence, and that declarations concerning the remaining two violations would be too abstract and uncertain to warrant this form of relief. Id. at *7.

II.

The Norris-La Guardia Act of 1932 (NLA) prohibited federal courts from granting injunctive relief in labor disputes. 29 U.S.C. § 104. In 1947, however, Congress enacted the LMRA, which gave federal courts jurisdiction over suits alleging violations of collective bargaining agreements. 29 U.S.C. § 185(a). In the 1950s, the use of arbitration to resolve labor disputes became a central and controlling component of federal labor policy. See Textile Workers Union v. Lincoln Mills, 353 U.S. 448, 455 (1957). In the Steelworkers trilogy in 1960, moreover, the Supreme Court strengthened the requirement for arbitration under collective bargaining agreements. See United Steelworkers v. Am. Mfg. Co., 363 U.S. 564 (1960); United Steelworkers v. Warrior

& Gulf Navigation Co., 363 U.S. 574 (1960); United Steelworkers v. Enter. Wheel & Car Corp., 363 U.S. 593 (1960).

There was some tension between the NLA, the LMRA, and this emphasis on arbitration.  The Supreme Court found there was a need for some adjustment of the prohibition against enjoining strikes contained in the NLA in light of the LMRA and the use of arbitration.  In Boys Markets[2] the Court held that, despite the anti-injunction provisions of § 4 of the NLA, a federal court in LMRA § 301(a) cases may issue limited injunctive relief to protect the effectiveness of arbitration agreements:

> [T]he very purpose of arbitration procedures is to provide a mechanism for the expeditious settlement of industrial disputes without resort to strikes, lockouts, or other self-help measures.  This basic purpose is obviously largely undercut if there is no immediate, effective remedy for those very tactics that arbitration is designed to obviate.

Boys Markets, 398 U.S. at 249.  The Court expressed concern that incentives for employers to agree to submit grievances to arbitration would be inappropriately dissipated[3] if employers were

---

[2]    Boys Markets overruled Sinclair Refining Co. v. Atkinson, 370 U.S. 195 (1962), an earlier effort among a series of efforts to reconcile these tensions.  See Boys Mkts., Inc. v. Retail Clerks Union, Local 770, 398 U.S. 235, 237-38 (1970); see generally, Paula L. McDonald, Comment, Judicial Interpretation of Collective Bargaining Agreements: The Danger Inherent in the Determination of Arbitrability, 1983 Duke L.J. 848, 853-57.

[3]    VNE is not precluded from Boys Markets relief by the fact that only the Union could institute the grievances and arbitration processes under the CBA.  Once arbitration is sought, both parties

-13-

deprived of injunctive relief to enforce the quid pro quo of a no-strike clause.[4]  Id. at 248.

In Boys Markets, the Supreme Court established certain preconditions for the issuance of injunctive relief in labor disputes: (a) the existence of a no-strike clause, (b) clarity that the grievance in question was subject to arbitration, and (c) employer readiness to engage in such arbitration.  Id. at 253-54. In addition to these preconditions, there are other limitations on the grant of a Boys Markets injunction.  The injunction must also meet all the usual criteria for injunctive relief, including irreparable injury, likelihood of success on the merits, balancing of the equities, and consideration of the public interest.  Id. at

---

are bound to arbitrate.  If the Union grieves, then VNE must follow the procedures through arbitration.  That is all that Boys Markets, with its statement that "both parties are contractually bound" to arbitrate, 398 U.S. at 254, requires.  See also Avco Corp. v. Local Union #787, 459 F.2d 968, 972 (3d Cir. 1972).  Indeed, one-way grievance ratchets may increase the likelihood of employers seeking Boys Markets injunctions.  In any event, the Union has not asserted that the normal rules for Boys Markets cases are somehow altered by the fact that the CBA in this case contains such a one-way ratchet.

[4]     Some courts have recognized what is called "the reverse Boys Markets exception."  Aeronautical Indus. Dist. Lodge 91 v. United Techs. Corp., 230 F.3d 569 (2d Cir. 2000).  This exception "permits unions to obtain injunctions against employers to preserve the status quo pending arbitration of a labor dispute as long as: (1) the underlying dispute is subject to mandatory arbitration; and (2) an injunction is necessary to prevent the arbitration process from becoming a 'hollow formality' or 'meaningless ritual.'"  Id. at 581 (quoting Niagara Hooker Emps. Union v. Occidental Chem. Corp., 935 F. 2d 1370, 1377, (2d Cir. 1991)); see also Lever Bros. Co. v. Int'l Chem. Workers Union, 554 F.2d 115, 123 (4th Cir. 1976).

-14-

254. Further, the Court held that an employer "should be ordered to arbitrate, as a condition of . . . obtaining an injunction against the strike." Id. (quoting Sinclair Refining Co. v. Atkinson, 370 U.S. 195, 228 (1962) (Brennan, J., dissenting)).

Many years ago this Court held there are three conditions for injunctive relief under Boys Market: "(1) the collective bargaining agreement must contain mandatory arbitration procedures; (2) the strike to be enjoined must be over an arbitrable grievance; and (3) 'ordinary principles of equity' must warrant the injunctive relief." Nat'l Elevator Indus., Inc. v. Int'l Union of Elevator Constructors, 776 F.2d 374, 376-77 (1st Cir. 1985) (quoting Int'l Detective Serv., Inc. v. Int'l Bhd. of Teamsters, Local 251, 614 F.2d 29, 31 (1st Cir. 1980)). The first two of these conditions are clearly met in this case. As to the first, there is no question that the collective bargaining agreement contains mandatory arbitration procedures. As to the second, the presumption of arbitrability applies in Boys Markets cases, see Gateway Coal Co. v. United Mineworkers, 414 U.S. 368, 379-82 (1974), and the disputes at issue here certainly appear to be over arbitral grievances. The third condition presents a steeper climb for VNE.

Our analysis is informed by both statutory constraints and limits stemming from the rationale for the Boys Markets injunction. As to statutory restrictions, Boys Markets injunctions

-15-

are limited by § 9 of the NLA, which requires that injunctions contain "only a prohibition of such specific act or acts as may be expressly complained of in the . . . complaint or petition filed" in the case.  29 U.S.C. § 109; Latas Libby's, Inc. v. United Steelworkers, 609 F.2d 25, 31 (1st Cir. 1979).[5]  As to limits stemming from the rationale in Boys Markets, the Supreme Court has held that a Boys Markets injunction can only issue if the dispute is "over" issues which the striking union is obligated to arbitrate. Buffalo Forge Co. v. United Steelworkers, 428 U.S. 397, 407 (1976).  In so holding, the Court responded to risks that employers would seek court determinations on issues of arbitrability meant to be left to arbitrators.

Under Buffalo Forge, the underlying grievance, not just the activity to be enjoined, must be governed by the arbitration requirement.  If there were no requirement to arbitrate that grievance, any injunction could hardly be in aid of arbitration. Id.  When it is clear the strike is not "over" such issues, no injunction may issue.  In Buffalo Forge, the Court held that it was

---

[5]     While this circuit apparently has not reached the question, see Otis Elevator Co. v. Int'l Union of Elevator Constructors, Local 4, 408 F.3d 1, 7 n.5 (1st Cir. 2005), most courts have concluded that the requirements of § 7 of the NLA also apply to Boys Markets injunctions.  That section, 29 U.S.C. § 107, specifies certain procedural and evidentiary requirements. See 1 John E. Higgins, Jr., The Developing Labor Law 1449 n.255 (5th ed. 2006) (collecting cases).  The Supreme Court has not addressed the question of the applicability of these NLA requirements in Boys Markets cases. Id.

error to issue a Boys Markets injunction against a sympathy strike which "had neither the purpose nor the effect of denying or evading an obligation to arbitrate or of depriving the employer of its bargain." Id. at 407-408. The Supreme Court reinforced this requirement in Jacksonville Bulk Terminals v. International Longshoremen's Ass'n, 457 U.S. 702 (1982), holding that a Boys Markets injunction should not issue to stop a politically motivated boycott that was plainly not arbitrable. Id. at 721.

This court has read Boys Markets such that frustration of the arbitral process does not necessarily establish irreparable injury for purposes of injunctive relief. In Latas Libby's, we affirmed a district court's finding that a union had violated a no-strike clause and affirmed the district court's award of damages for the illegal strike. Latas Libby's, 609 F.2d at 28-30. We vacated, however, prospective injunctive relief as to future strikes. The injunction had required the union to comply in all future actions with the no-strike clause of the CBA. Id. at 30. This court held that given that the record disclosed no prior violations of the no-strike agreement, the prospective injunctive relief went further than needed. Id. at 30-32. We commented, "[a]lthough we do not say that repeated violations of a no-strike covenant never warrant broad prospective relief, in the absence of any showing here of a continuing course of conduct evidencing the unwillingness of the Union to abide by the no-strike provision,"

-17-

the district court's injunction was too broad to stand.  Id.  We also noted that the broad relief granted would violate § 9 of the NLA.  Id. at 31.

This court has also reaffirmed the requirement that injunctive relief may only be granted under Boys Markets in furtherance of the arbitral process.  In Tejidos de Coamo, Inc. v. International Ladies' Garment Workers' Union, 22 F.3d 8 (1st Cir. 1994), we held that an order on behalf of an employer staying arbitration, id. at 11, was an immediately appealable injunction and that the injunction was not validly issued under Boys Markets, see id. at 12-13.  There, injunctive relief could not be justified "on either ground--to enforce a contract or support arbitration--let alone both."  Id. at 12.  That an order staying arbitration could not be in support of arbitration was self-evident.  Id.  The company argued that there was no contract requiring arbitration and that it could not be forced into arbitration.  Id.

In addition to vacating overly broad injunctive relief and injunctive relief that did not advance the arbitral process, this court has also reversed grants of Boys Markets injunctive relief for failure to meet the traditional four-part equitable test.  See Anheuser-Busch, Inc. v. Teamsters Local No. 633, 511 F.2d 1097, 1100 (1st Cir. 1975) (holding that the balance of relative harms to the parties showed employer did not meet its burden).

-18-

Neither the Supreme Court nor this court has imposed any requirements as to the sequence of decision making on issues presented by Boys Markets injunction requests.  Cf. Pearson v. Callahan, 129 S. Ct. 808, 818-21 (2009) (holding that there is no mandatory order of decisionmaking in qualified immunity cases). There is no reason why the district court could not jump, as it did, to the irreparable injury issue, and so we turn to that.  We review denials of injunctive relief for abuse of discretion, reviewing underlying legal questions de novo.  Animal Welfare Inst. v. Martin, 623 F.3d 19, 26 (1st Cir. 2010).

VNE argues that the district court made several errors in its denial of injunctive relief.  Primarily, it argues the court misapprehended the nature of the harm at issue by measuring the direct harm caused by each alleged CBA violation.[6]  VNE argues that the court should have taken the four alleged violations as a whole and assessed "the harm to the arbitral process caused by the Union's repeated resort to picketing and strikes over matters the Union seems to agree are subject to the grievance and arbitration provisions of the CBA."

In the more common case in which Boys Markets injunctions have been issued, the strike is occurring at the time of suit or is

_____

[6]    We note but do not reach VNE's argument that the district court erred in its balance of the hardships analysis because, in its view, the Union could not be harmed by taking matters to grievance and arbitration.

-19-

imminent.  See 1 John E. Higgins, Jr., The Developing Labor Law 1461 (5th ed. 2006).  Boys Markets itself concerned an ongoing violation of a no-strike clause.  Boys Markets, 398 U.S. at 239-40. In theory, questions may arise as to the application of Boys Markets to job actions short of actual strikes.  But we have held that activities short of an actual strike may also violate no-strike clauses, including work slowdowns and concerted refusals to work overtime.[7]  Nat'l Elevator Indus., 776 F.2d 374; see also Avco Corp. v. Local Union #787, UAW, 459 F.2d 968, 974 (3d Cir. 1972) (holding that concerted refusals to work overtime fell within the proscriptions of a CBA no-strike clause and were subject to injunctive relief under Boys Markets).

The fact that there is no present ongoing dispute as to these four alleged violations does not, of course, mean the case is moot.  See Jacksonville Bulk Terminals, 457 U.S. at 704 n.1 (suit by employer under LMRA § 301 is not mooted by cessation of work stoppage).  But that fact does go to the issue of irreparable harm. Patterns of repeated past strikes in violation of no-strike clauses may support issuance of prospective injunctive relief even when there is no ongoing strike.  As the district court recognized, however, in this case the four alleged job actions were not full-

---

[7]    VNE's complaint details other clauses in the CBA that it alleges are violated by the Union's actions, but we need not delve into whether other types of clauses subject to mandatory arbitration may support a Boys Markets injunction as those other clauses are not invoked on appeal.

-20-

blown strikes, nor do the alleged actions establish a repeated pattern giving rise to ongoing harm. VNE's assertion that the four alleged breaches threaten "death by pin pricks," Verizon New England, 2010 WL 3282605, at *7 n.7, is insufficient. The district court did not abuse its discretion in holding that the threshold of irreparable injury had not been met.

III.

The Supreme Court has indicated that appellate review of discretionary decisions not to grant declaratory relief is generally for abuse of discretion. See Wilton v. Seven Falls Co., 515 U.S. 277, 289-90 (1995). It has "repeatedly characterized the Declaratory Judgment Act as 'an enabling Act, which confers a discretion on the courts rather than an absolute right upon the litigant.'" Id. at 287 (quoting Pub. Serv. Comm'n of Utah v. Wycoff Co., 344 U.S. 237, 241 (1952)). The Court has not yet established the contours of that abuse of discretion review except in cases where the denial is based on there being a parallel proceeding which presents the opportunity to ventilate the same state law issues in the state courts. See id. at 290. Wilton expressly declined "to delineate the outer boundaries of that discretion" in cases raising issues of federal law, id., such as the case before us.[8]

_____

[8] In a pre-Wilton case this court held that where the district court holds it lacks jurisdiction to issue a declaratory judgment because a case is not ripe, that issue is usually reviewed de novo. Ernst & Young v. Depositors Econ. Prot. Corp., 45 F.3d 530, 534 (1st Cir. 1995). As to the discretionary aspects of a

-21-

Out of caution, we apply an abuse of discretion standard of review to all aspects of the denial of a declaratory judgment here, with the important caveat that errors of law constitute an abuse of discretion.  Voice of the Arab World, Inc. v. MDTV Med. News Now, Inc., No. 10-1396, 2011 WL 2090132, at *3 (1st Cir. May 27, 2011).  At any rate, we reach the same result under any standard of review.  See Rossi v. Gemma, 489 F.3d 26, 38 n.21 (1st Cir. 2007).

We start with the basics.  Requests for a declaratory judgment may not be granted unless they arise in a context of a controversy "ripe" for judicial resolution.  Abbott Labs. v. Gardner, 387 U.S. 136, 148-49 (1967), abrogated on other grounds by Califano v. Sanders, 430 U.S. 99, 105 (1977).  Ripeness is an Article III jurisdictional requirement.  The need for ripeness is emphasized in the Declaratory Judgment Act (DJA), 28 U.S.C.

_____

decision to withhold declaratory judgment, we said in Ernst & Young that we hewed a middle ground, between de novo and abuse of discretion review.  Id.  "This standard encourages the exercise of independent appellate judgment if it appears that a mistake has been made."  Id.  It is unclear whether Wilton overruled Ernst & Young on this point, at least in federal question cases.
Our case law post-Wilton has articulated both standards of review.  In a case involving a student's claim for declaratory relief under IDEA, we adhered to the Ernst & Young formulation.  See Diaz-Fonseca v. Puerto Rico, 451 F.3d 13, 39 (1st Cir. 2006).  However, in two other cases, we stated the standard of review for denial of declaratory relief as a simple abuse of discretion standard, without discussing Wilton's caveats.  See Hartford Fire Ins. Co. v. R.I. Pub. Transit Auth., 233 F.3d 127, 130 (1st Cir. 2000); DeNovelis v. Shalala, 124 F.3d 298, 313 (1st Cir. 1997).

-22-

§ 2201(a), which refers to an "actual" controversy. This is a sine qua non of any assumption of federal jurisdiction.

In Ernst & Young v. Depositors Economic Protection Corp., 45 F.3d 530 (1st Cir. 1995), we interpreted Abbott Labs. to hold that where challenges are asserted to government actions and ripeness questions arise, a court must consider both "fitness" for review and "hardship." Id. at 535. The "fitness" inquiry concerns questions of finality, definiteness, and the need for further factual development. Id. Under "hardship," the court should consider whether the challenged action "creates a 'direct and immediate' dilemma" for the parties. Id. (quoting W.R. Grace & Co. v. EPA, 959 F.2d 360, 364 (1st Cir. 1992)). As we have reaffirmed since our decision in Ernst & Young, these inquiries are highly fact-dependent, such that the "various integers that enter into the ripeness equation play out quite differently from case to case." Doe v. Bush, 323 F.3d 133, 138 (1st Cir. 2003) (quoting Ernst & Young, 45 F.3d at 535).

Before the district court, the Union argued that declaratory relief should not be granted because VNE's allegations were not of "sufficient immediacy or controversy" to warrant the exercise of the court's discretion. It argued that the controversy was no longer ongoing, and that VNE had not shown that the arbitral process had failed to function properly. In State of R.I. v. Narragansett Indian Tribe, 19 F.3d 685 (1st Cir. 1999), we rejected

-23-

such a confined approach to considering the question of "hardship." In that case, we firmly held that "this part of the [ripeness] inquiry should focus on the judgment's usefulness."  Id. at 693. We held that "[r]ather than asking, negatively, whether denying relief would impose hardship, courts will do well to ask, in a more positive vein, whether granting relief would serve a useful purpose, or, put another way, whether the sought-after declaration would be of practical assistance in setting the underlying controversy to rest."  Id.

The district court identified this governing standard, but its analysis did not comport with the standard's requirements.  The court concluded that the first two of the four claimed CBA violations could not meet the ripeness requirement because "they pertain to discrete past incidents that present no threat of recurrence."  Verizon New England, 2010 WL 3282605, at *7.  It allowed that there could be possible future harm to VNE from renewed boycotts of voluntary overtime or wildcat picketing, but held it would be inappropriate to comment on future events.  Id. As to the overtime boycotts, the court stated that it "would be uncomfortable ordering employees to do what [VNE] itself characterizes as a voluntary act," and that VNE had not shown that the overtime boycotts posed a "substantial hardship."  Id.  As to the alleged picketing, it held that any effort "to define in the abstract when picketing is or is not lawful (or appropriate) is a hopeless task

-24-

given the myriad forms that speech can take in the context of a labor dispute." Id.

This articulation mischaracterizes VNE's request for declaratory relief, which went to the four alleged CBA violations and sought a declaration as to their legal effects. VNE did not request that the court define in the abstract when picketing is lawful, nor did it request that the court issue a declaratory order requiring employees to volunteer for overtime. Nor did VNE rest its request for declaratory relief on the premise that work stoppages and Union communications about company tools would continue to occur in the future as they had in the past. Rather, VNE requested a declaration as to the lawfulness of the particular acts described in its complaint under the no-strike clause of the CBA.

The dispute about the legal effect of these four alleged violations is clearly ripe, as Article III requires. The actions have happened; it is the legal effects of these actions under the no-strike clause and LMRA § 301 that are at issue. "There is little difficulty in finding an actual controversy if all of the acts that are alleged to create liability have already occurred. The court is then merely being asked, as in any litigation, to determine the legal consequences of past events . . . ." 10B Charles Alan Wright et al., Federal Practice and Procedure § 2757, at 475 (1998). VNE seeks a declaration that the Union's past actions contravened the no-strike clause of the CBA and frustrated the company's bargained-

-25-

for quid pro quo that such matters be resolved through arbitration. This is not a situation where a declaration is sought on the legal consequences of a hypothetical act that may or may not occur in the future. Id. at 475-476.

Nor does a decision that the harm to VNE does not warrant preliminary injunctive relief preclude an examination of whether VNE should nonetheless be granted a declaratory judgment. See Powell v. McCormack, 395 U.S. 486, 499 (1969) ("A court may grant declaratory relief even though it chooses not to issue an injunction or mandamus."). More than that, "a federal district court has the duty to decide the appropriateness and the merits of the declaratory request irrespective of its conclusion as to the propriety of the issuance of the injunctions." Zwickler v. Koota, 389 U.S. 241, 254 (1967). The DJA itself states that declaratory judgment may be granted "whether or not further relief is or could be sought." 28 U.S.C. § 2201(a). The Act embodies the view that declaratory relief is alternative or cumulative, and not extraordinary relief. 10 Wright et al., supra § 2758, at 508.

Further, this court has recognized the utility of declaratory judgments in cases brought under § 301 of the LMRA in which injunctive relief is denied. In Tejidos de Coamo, this court remanded for consideration of a request for declaratory relief in a § 301 LMRA action where we had reversed the grant of injunctive relief:

-26-

> Although section 301 actions are ordinarily brought to enforce contracts, the Declaratory Judgment Act, 28 U.S.C. §§ 2201-02, permits the declaration of rights about which a real controversy exists, and the Unions have not disputed the district court's authority to grant declaratory relief.

Tejidos de Coamo, 22 F.3d at 15. Importantly, Tejidos also emphasized that the constraints on injunctions in Boys Markets type cases do not apply to the relief of declaratory judgment. As we said, "Nor does section 7 [of the NLA, 29 U.S.C. § 107] pose any barrier to such a declaration; it is directed only against injunctions." Id. The NLA provides no protection against actions for declaratory relief. Wilkes-Barr Pub. Co. v. Newspaper Guild of Wilkes-Barre, Local 120, 647 F.2d 372, 379 (3d Cir. 1981).

Even if an injunction is unwarranted, an adjudication as to whether the events at issue in this litigation establish CBA violations that undercut the arbitral process could be of assistance in settling the underlying controversy. Whether there has been a pattern of evasion of arbitration through violations of a no-strike provision is highly relevant to whether future injunctive relief should be granted if the pattern recurs. See Latas Libby's, 609 F.2d at 31-32; see also Powell, 395 U.S. at 499. Future relief aside, declaratory relief can have a current utility. As the Third Circuit noted in affirming a denial of injunctive relief but remanding for consideration of declaratory relief, a "declaration that . . . breaches did or did not occur certainly would aid the

-27-

parties in understanding their mutual obligations under the contract." <u>Bituminous Coal Operators' Ass'n, Inc.</u> v. <u>Int'l Union, United Mine Workers of Am.</u>, 585 F.2d 586, 595 (3d Cir. 1978), <u>abrogated on other grounds by</u> <u>Carbon Fuel Co.</u> v. <u>United Mine Workers of Am.</u>, 444 U.S. 212, 216 & n.4 (1979).

If we thought VNE's claims were easily rejected on their merits, we would not remand. But that is not the case. Certain of the claims that these actions by the Union have violated VNE's rights under the CBA are substantial and merit serious consideration. Declaratory relief, of course, may not be used to supplant the role of the arbitrator in interpreting the provisions of the contract. It may be useful, however, in determining whether the actions at issue have undercut the arbitral process. <u>Cf.</u> <u>Buffalo Forge</u>, 428 U.S. at 407.

### III.

We affirm the denial of injunctive relief, reverse the denial of declaratory relief, and remand for further consideration of declaratory relief. No costs are awarded.